Stephen W. NOEY, Appellant,

v.

DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Appellee.

No. S–1274.

Supreme Court of Alaska.

May 29, 1987.

---

798

John R. Beard, Beard & Lawer, Anchorage, for appellant.

Joseph W. Geldhof, Asst. Atty. Gen., Juneau, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

OPINION

Before RABINOWITZ, C.J., and BURKE, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

This appeal arises from a decision of the Commissioner of the Alaska Department of Environmental Conservation which upheld the Department's refusal to approve Stephen Noey's proposed subdivision wastewater treatment and disposal plans. The superior court affirmed the Commissioner's decision. We reverse and remand for further proceedings.

I. *Background.*

Stephen Noey owns 16.17 acres of land on the east shore of Bear Cove, which is located on the south side of Kachemak Bay, sixteen air miles from Homer. Bear Cove is accessible only by boat or float plane, and neither electricity nor groundwater is available on the property. Water can be transported to the property or collected from precipitation, which averages twenty-five inches annually.

Noey, a real estate developer, subdivided the property into fifteen one-acre lots, which he intended to sell as remote recreational lots. The Kenai Peninsula Borough platting authority approved the subdivision. Thereafter, in September 1982, Noey submitted his first subdivision plan for review by the Alaska Department of Environmental Conservation (DEC) as required by 18 AAC 72.065. Recognizing that the Bear Cove soil investigation data demonstrated conditions which would severely limit the range of wastewater disposal systems available, Noey's engineer proposed the use of a mound waste treatment and disposal system. In October 1982, DEC rejected Noey's subdivision plan.

Noey then requested an administrative appeal, but continued discussions with various DEC officials in attempts to resolve the wastewater treatment and disposal issue. In February 1983, Noey submitted his second subdivision plan, proposing the use of propane-fired waste treatment and disposal systems. DEC also rejected this proposal. Thereafter, on April 11, Noey submitted his third plan, proposing a composting system for treating and disposing of human and food wastes, and a sand filter or settling tank system for graywater treatment and disposal.[1] Again, DEC rejected Noey's proposal.

In July 1983, Noey renewed his demand for an adjudicatory hearing pursuant to 18 AAC 15.200. In this demand, he also requested that DEC accept his proposal to use propane incinerators for waste treatment and disposal.[2]

A hearing was held on March 5-6, 1984, at which Noey and DEC presented testimonial and documentary evidence. The hearing officer, a DEC environmental engineer, subsequently issued proposed findings of fact and conclusions of law affirming DEC's rejection of Noey's proposals. The Commissioner of DEC adopted the hearing officer's findings and conclusions and thus affirmed the DEC decisions. Noey appealed to the superior court, which affirmed

---

1. "Graywater" means domestic wastewater from laundry, kitchen, sink, shower, bath, or other sources which does not contain excrement, urine, or combined stormwater. 18 AAC 72.-990(24) (Eff. 8/10/73).

2. In further meetings with DEC in January and February 1984, Noey offered another proposal, which DEC also rejected.

the Commissioner's decision. This appeal followed.

## II. *Has DEC Adopted Appropriate Standards for Review of Subdivision Proposals?*

■ Noey argues that DEC has not adopted regulations setting standards governing the subdivision of land and may not prohibit his proposed subdivision in the absence of standards. This issue involves basic principles of statutory interpretation and thus presents a question of law. Accordingly, no particular deference is owed to the agency's interpretation of the applicable statutes. *Kelly v. Zamarello*, 486 P.2d 906, 916–17 (Alaska 1971), *quoted in Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408, 411–12 (Alaska 1973); *see also* 4 K. Davis, *Administrative Law Treatise* § 30.14, at 269 (1958).

■ DEC cites three statutory provisions as the basis for its promulgation of 18 AAC 72.065 (Eff. 2/23/77), pursuant to which it denied Noey's proposed subdivision plans.[3]

AS 46.03.020(10) provides in part that "[t]he department may ... adopt regulations necessary to effectuate the purposes of this chapter, including, by way of example and not limitation, regulations providing for (A) control, prevention and abatement of ... pollution," and "(D) collection and disposal of sewage...." AS 46.03.050 provides that "[t]he department has jurisdiction to prevent and abate the pollution

---

**3.** 18 AAC 72.065 provides:

SUBDIVISION PLAN REVIEW. (a) A person proposing a subdivision shall submit the following information to the department ...:
(1) a drawing and written description showing proposed sewers, domestic wastewater treatment works and disposal systems, and potential or existing drinking water sources for each typical set of on-site conditions existing within the subdivision; the department will, in its discretion, waive the requirements of this paragraph when it finds the information is not needed for plan review;
(2) a plot plan showing spacial relationships between wastewater disposal and drinking water systems on nearby lots; the department will, in its discretion, waive the requirements of this paragraph when it finds the information is not needed for plan review;
(3) soil information sufficient to determine suitability for a domestic wastewater disposal system, if a soil absorption system is proposed, including soil tests, borings, test holes, or percolation tests required by 18 AAC 72.026, approved and signed by a registered engineer;
(4) a map of the proposed subdivision showing
 (A) lot and street layout with lot dimensions and areas;
 (B) contours which show topography, drainage, muskeg, and marshy or wet areas;
 (C) existing or proposed improvements;
 (D) waters located within and 200 feet around the proposed subdivision;
 (E) waters suitable for drinking water sources; and
 (F) nearest road or highway accesses;
(5) a statement and timetable concerning the possible development of future community drinking water or sewer systems to the extent known;
(6) a statement identifying persons who will own, operate, and maintain water supply systems, sewers, treatment works, and disposal systems in the proposed subdivision;
(7) types and amounts of sewage, graywater, or other wastes that would be generated on a typical lot in the subdivision;
(8) information, including a timetable, for domestic wastewater disposal systems which require electrical service or road access, including electrical service needed for domestic wastewater treatment and pumping equipment, transportation access for material and equipment needed to construct the proposed domestic wastewater treatment works, disposal system, holding tank, and septic tank pumping service; and
(9) location of storm sewers, drainage ditches, their ultimate discharges, and treatment, if required to protect receiving waters.
(b) The department will issue a decision to the applicant within 30 days after receipt of complete subdivision plans.
(c) The department will, in its discretion, attach terms and conditions to subdivision plans needed to ensure compliance with this chapter.
(d) The subdivider shall include the terms and conditions of the department's subdivision plan approval for domestic wastewater treatment and disposal systems on the subdivision's plat and instruments.
(e) The department will place its approval of the plan on the subdivision's final plat before recording. Department approval must appear on the plat of record and recorded instruments.
(f) A person creating a subdivision may sell, contract to sell, lease, or otherwise convey an interest in any lot within that subdivision only with plan approval for that subdivision under this section.

of the waters of the state." AS 46.03.090 provides:

PLANS FOR POLLUTION DISPOSAL. The department may require the submission of plans for sewage and industrial waste disposal or treatment or both for a publicly or privately owned or operated industrial establishment, community, public or private property subdivision or development.

Noey contends that 18 AAC 72.065 neither sets nor intimates standards by which DEC will grant or withhold approval of submitted subdivision plans. Noey argues that when the law directs an executive agency to establish standards by which executive action will be taken, the agency must announce the standards by which it decides matters before it undertakes to make a decision.[4]

There is no question that DEC has in fact adopted many regulations which set standards for the quality of domestic wastewater that may be disposed of into the environment, as well as standards for the design, construction, and installation of systems for the treatment and disposal of domestic wastewater.[5] Noey admits as much, but asserts that these types of activities are not activities in which he is proposing to engage at Bear Cove. Implicit in Noey's argument is the notion that to the extent that DEC has chosen to require submission of plans for treatment and disposal of sewage in proposed subdivisions, it must comply with AS 44.46.020(2) and set standards which will guide the agency's decisionmaking and afford individual developers notice of what standards they are expected to meet. Otherwise the agency wields unbridled administrative discretion.

The question thus becomes whether DEC is required to promulgate regulations setting specific standards by which it approves or rejects subdivision plans. Although there is nothing in AS 44.46.020 that expressly requires DEC to do so, we hold that the DEC has promulgated minimum standards in 18 AAC 72.065.

**4.** Noey cites *United States Smelting v. Local Boundary Comm'n,* 489 P.2d 140 (Alaska 1971), for this proposition.

## III. Did DEC Act Arbitrarily and Capriciously in Denying Noey's Various Subdivision Proposals?

### A. Standard of Review.

 DEC correctly asserts that a reviewing court should not set aside an agency's findings of fact and determinations except upon a showing that they are not supported by substantial evidence in the record as a whole or that they have no reasonable basis in law. *City of Fairbanks v. Alaska Public Utils. Comm'n,* 611 P.2d 493, 495 (Alaska 1980). This standard serves three purposes:

First, it helps to ensure that the agency does not make decisions that have no adequate basis in fact; second, it gives opposing parties the opportunity to challenge the agency's reasoning process and the correctness of the decision; and third, it affords reviewing courts the opportunity to evaluate the decision.

*Id.*

Further, the reasonable basis standard "is invoked in cases where the agency action involves either questions of fundamental policy formulation or an assessment of technical data related to complex subject matter which requires the particularized knowledge and experience of the administrative personnel for their determination."

*United States v. RCA Communications, Inc.,* 597 P.2d 489, 507 (Alaska 1978) (quoting *Alaska Public Utils. Comm'n v. Greater Anchorage Area Borough,* 534 P.2d 549, 558–59 (Alaska 1975)), *aff'd on rehearing,* 597 P.2d 512 (Alaska 1979). The reasonable basis test is similar to the standard of unreasonable, arbitrary, and capricious action under which actions committed to agency discretion are traditionally reviewed. *Storrs v. State Medical Bd.,* 664 P.2d 547, 554–55 (Alaska) (per curiam), *cert. denied,* 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983); *Jager v. State,* 537 P.2d 1100, 1107 (Alaska 1975).

**5.** *See generally* 18 AAC 72.020–.100.

## B. *Noey's First Proposal.*

■ In his first proposal submitted in September 1982, Noey recommended that mound-type systems for waste treatment and disposal should be installed. Noey submitted the basic data required by 18 AAC 72.065. Noey also stated that it was his intention to place a note of restriction on the plat of his subdivision: "Conventional on-site sewage disposal systems are prohibited. Alternate systems must be approved by the Alaska Department of Environmental Conservation prior to installation." Noey's plat restriction is similar to the restrictions which the Alaska Department of Natural Resources (DNR) utilized, with DEC's approval, in three recent state subdivision notices. These DNR subdivision notices state in part:

All lots have been approved by the Department of Environmental Conservation for non-water carried type sewage disposal systems (i.e. chemical, humus, incendiary, etc.). Anyone wishing to install any other type of disposal system must first receive approval from the Department of Environmental Conservation.

No individual water supply system or sewage disposal system shall be permitted on any lot unless such system is located, constructed and equipped in accordance with the requirements of the Alaska Department of Environmental Conservation. Approval of such systems shall be obtained from said authority.

DEC refused to approve Noey's first subdivision plan because "[i]t has not been demonstrated that there will exist practical means of sewage treatment and disposal within the subdivision which meets [sic] the requirements of 18 AAC 72 and 18 AAC 70." DEC also asserted that "[t]he inclusion of a plat note indicating that all systems must be approved by the Department of Environmental Conservation prior to installation does not provide sufficient evidence that practical systems can be designed." DEC observed that mound systems typically require electricity to power pumps to lift and distribute waste effluent over the mound. DEC further explained that "[t]he cost of designing and constructing the system must not be prohibitive. This will provide some assurance that such systems are practical." DEC also expressed its concern that most lots on Noey's subdivision contained slopes in excess of thirty percent, possibly creating slope instability problems in mound construction.[6]

The hearing officer found that Noey had not submitted adaptations of generic mound system designs to show how a mound system could be accommodated to the site-specific factors of soil depth, slope, or lot size. He also found that convincing testimony was offered to demonstrate that mound systems do not work well where land slope exceeds ten percent, and that the slope of many of the Bear Cove lots does exceed ten percent.

The hearing officer further held that the first proposal was not suited to the steep slopes of the subdivision, and the testimony supported this conclusion. DEC's assessment of this technical data related to a complex subject which required DEC's particularized knowledge and experience. *See United States v. RCA*, 597 P.2d at 507. Thus, with respect to Noey's first proposal, we hold that DEC's denial was not arbitrary and capricious.

## C. *Noey's Second Proposal.*

■ In response to DEC's rejection, Noey submitted his second subdivision plan. This time he proposed the use of propane-fired incineration systems for waste disposal. Noey also re-emphasized his view that given the lack of electricity and difficulty of access, the Bear Cove subdivision was only suitable for seasonable recreational use.

DEC rejected Noey's second proposal, stating in part that

[t]he Department currently has no objections to individuals utilizing these [propane-fired incinerating] units for waste

---

**6.** DEC did not indicate in any way that Noey's data or other on-site information provided in his proposal was insufficient, nor did DEC object to the soil test methodology or results.

disposal. However, the units do not have the history of successful operations in Alaska which would cause the Department to approve subdivisions based solely on their use. [Noey's] request, therefore, cannot be granted.[7]

There is no requirement in 18 AAC 72.065 that a proposed disposal system have a "history of successful operations in Alaska." DEC admits that propane incinerators work adequately for waste disposal on individual lots, and presumably DEC would approve their use if an individual were submitting a waste disposal plan. Further, Noey's expert testified that there was a significant history of successful operation of propane incinerators in Alaska, and the hearing officer found as a matter of fact that "[c]onvincing testimony was advanced ... citing the use of such devices during the construction of the oil pipeline from the North Slope to Valdez, Alaska." Although the hearing officer also found that "[t]he testimony did not, however, address the DEC objection that such units did not have a history of successful operation in individual homes," this finding is contrary to DEC's statement, and there appears to be no reason to compel Noey to address this issue in light of DEC's own admission that "[t]he Department currently has no objections to individuals utilizing these units for waste disposal."[8]

Absent a standard requiring a history of successful operations in subdivisions in Alaska, and given the hearing officer's finding that Noey's expert testified convincingly that propane units in fact have been successfully used in pipeline camps from the North Slope to Valdez, we hold that DEC's rejection of Noey's second subdivision plan was arbitrary and not supported by substantial evidence.

### D. *Noey's Third Proposal.*

Noey responded to DEC's second rejection by proposing a third alternative waste disposal system for the Bear Cove subdivision. This time, Noey suggested a composting system for disposing of human and certain food wastes. Noey included documentation showing "one type of composting system that has apparently been tested and proven to work under almost any climatic [sic] conditions." The proposal also suggested a settling tank or sand filter system for the graywater, which would be "not only simple to construct but will be easy to replace as needed." Noey again emphasized the remote nature of the Bear Cove subdivision.

DEC rejected this proposal on the ground that it "will result in wastewater discharges to the surface of the land which can impact adjacent properties or the coastal marine environment." Thus, according to DEC, "substantially larger lots would be needed to contain any and all waste within the property boundaries." For the first time, DEC objected that

the size and number of [Noey's] proposed lots coupled with similar requests in this area cast doubt on whether this area would be utilized exclusively for recreational purposes. Consequently, we must assume that some lot utilization will result in larger waste flows than experienced by recreational use.

▮▮▮ DEC's regulations do not specify any particular lot size, only that lot location and dimensions be given.[9] Further, no standards distinguish between full-time residential and recreational subdivision use. A developer need not submit worst case population growth proposals, but rather must submit "a statement and timetable concerning the possible development of future known community drinking water or sewer systems to the extent known."[10] The developer need not calculate or predict the types and amounts of waste applicable

---

7. We again note that in its second rejection, DEC did not object to the quality or quantity of Noey's data.

8. We think it significant that DNR's notices of subdivision contain plat restrictions similar to Noey's stating that DEC has approved the use of incendiary systems and that anyone wishing to install any other system must receive DEC approval.

9. 18 AAC 72.065(a)(4).

10. 18 AAC 72.065(a)(5).

to every lot, but must show only the "types and amounts of sewage, graywater, or other wastes that would be generated on a typical lot in the subdivision."[11] Based on the foregoing and on our review of the record, we conclude that Noey's third proposal met the facial requirements of 18 AAC 72.065.

■ As to the substance of DEC's decision, the hearing officer found that DEC's rejection of Noey's third proposal did not respond to the merits of the composting system. He also found that "[t]estimony raised reasonable doubt that settlement and/or sand filtration system could be designed so as to effectively treat significant quantities of grey water [sic] under site conditions...." The record indicates, however, that a DEC official testified that a composting system could work if a full-time resident maintained the system. Further, the record shows that a DEC official testified that a sand filtration system would work if it contained an underdrain. Although Noey apparently did not specifically include an underdrain feature, his expert testified that the underdrain need not be eliminated, and would be easy to design and install.

Concerning DEC's new objection that the subdivision might experience larger waste flows than those generated by purely recreational users, the hearing officer observed that one of Noey's engineers had written a letter to DEC stating that "[w]ithout electrical power, the sewage volume problem is minimized." From this, the hearing officer found that "[t]his indicated the converse is also true if electrical power were available to the subdivision" and that the letter "implied that wastewater flows would increase when electrical power became available" because it "suggested that water usage changes would require individual lot owners ... to apply to the appropriate agencies with an acceptable solution to meet these changed conditions." Aside from DEC's speculation that electrical power may become available at some unspec-ified future date, however, there was no evidence adduced that power would be available.[12]

The hearing officer further found that "steep slopes and a thin soil mantel [sic] posed significant challenges to the engineer when wastewater flows approach those of full-time residential subdivisions." He observed that Noey's engineer "suggested" that "covenants could be included on the plat to restrict the amount of water which, through use, could become wastewater."

From these "implications" and "suggestions," the hearing officer found that "[t]he wastewater design proposed by the engineer was not intended to be a permanent long-term solution to the wastewater disposal needs of this subdivision." He thus held in part that denial of Noey's third proposal was appropriate because "the engineer's design was not long term but only temporary in nature. The responsibility to design permanent, practical and effective wastewater disposal would have fallen on the individual lot owners when the proposed system began to fail due to increased flow."

Here again we are struck by the fact that DNR, with DEC's approval, issued public notices of subdivisions containing plat restrictions similar to those proposed by Noey limiting use of those DNR subdivisions "for non-water carried type sewage disposal systems (i.e. chemical, humus, incendiary, etc.)." Presumably, chemical and humus systems would include compost, and incendiary would include propane incinerators. Further, the DNR subdivision notices also place the burden of constructing new disposal systems which meet DEC requirements on the individual lot owners. There is nothing remarkable about placing such a burden on future lot owners, and a DEC official testified that in a subdivision such as Noey's, an individual lot owner would have to obtain DEC approval for the individual's waste disposal system in any event.

---

**11.** 18 AAC 72.065(a)(7).

**12.** In rejecting Noey's first proposal, DEC relied on the absence of electrical power as one reason why a mound system would not work.

We hold that the applicable DEC regulations do not require a developer to design a permanent, long-term disposal system which will meet DEC's unproven speculations about permanent, full-time residential use. By its terms 18 AAC 72.065 requires a developer only to plan for and identify the possible development of future sewer systems to the extent known. If DEC wants developers to meet more definite standards, it should promulgate regulations explicitly articulating its requirements. Given the foregoing, we conclude that DEC's rejection of Noey's third subdivision plan was arbitrary and capricious.

### E. *Noey's Final Proposal.*

 Pending his administrative appeal of DEC's rejections of his proposals, Noey hired a consultant certified by DEC in the field of wastewater treatment and water microbiology to review the case file, evaluate the needs of the subdivision, and suggest means by which Noey could satisfy DEC's objections. The analysis and suggestions of the consultant, who also served as Noey's expert at the hearing, were presented to DEC in meetings and conversations. He proposed separating and treating the blackwater (excrement, urine, etc.) by composting, incineration, waterless systems, or pit privies, and treating the graywater by sand filtration. Calculating waste volumes based upon seasonal recreational use, the consultant initially proposed to discharge a minimal volume of treated graywater onto the ground surface.

DEC did not agree with Noey's prediction of only seasonal recreational use, and required him to calculate waste volumes based upon full-time residential use of each lot by a family of four. Noey complied with DEC's requirement and submitted a proposal which addressed both recreational and residential uses. This proposal utilized the same combined disposal designs as previously submitted, and also included a provision that any owner who placed a structure on the lot was required to install a graywater treatment system in accordance with plans approved by DEC. Noey submitted an illustration of how the sand filtration system could be adapted to accommodate full-time residency by pre-treating with a filter designed to criteria specified by the U.S. Environmental Protection Agency. DEC rejected this final proposal.

At the hearing, DEC for the first time objected that Noey had submitted insufficient information for the size of his lots. DEC also indicated for the first time that it did not believe the soil information was correct. At no time prior to the hearing had DEC ever hinted that Noey's data was inadequate.[13] In this case, DEC never notified Noey of its objections, nor did it ask him to conduct additional testing.

The hearing officer found as a matter of fact and concluded as a matter of law that the test data was not adequate to credibly represent the soil condition, and therefore held that the graywater disposal system lacked credibility. He also found, and during the hearing Noey's engineer conceded, that the soil percolation tests were not valid. Although we defer to DEC and the hearing officer in their assessment of the data as it relates to the disposal aspect of Noey's graywater sand filtration system, we conclude that DEC acted arbitrarily in its dealings with Noey by failing to notify him earlier of its objection to the soil data and by failing to give him an opportunity to provide additional data, particularly since DEC admitted it has given notice and opportunity to submit new data on other occasions. In the instant case Noey submitted four different proposals, and in rejecting each of them DEC failed to cite inadequate soil data as a reason for the rejection.

 The record also contains testimony that although DEC regulations do not distinguish between residential and remote sites, DEC sometimes relaxes the degree of proof required to verify the suitability of a lot for remote subdivisions. DEC specifically cited DNR's remote subdivision proposals as an example of when it would reduce the burden of proof for soil information. Noey argues that this demonstrates

---

**13.** There is testimony in the record that on other occasions when it did not agree with an engineer's soil information, DEC would request additional testing.

that DEC's decisions are arbitrary and capricious, because DNR—with DEC approval—makes remote subdivisions available to the public, approving humus, incineration, and pit privy waste disposal systems similar to those proposed by Noey which DEC rejected. Similarly, DEC approved of DNR's utilization of a plat restriction prohibiting any other system proposed by the individual lot owner without DEC approval, yet rejected Noey's identical approach. We agree with Noey. We discern no principled basis for distinguishing between DNR's subdivision proposals and Noey's subdivision proposals.

■■■ The record also shows that one of the factors DEC considers in determining when a site is remote enough to relax the soil suitability burden of proof is lot size. DEC admitted in response to Noey's objection that "actual minimum lot sizes are not stipulated by the regulation." Nevertheless, DEC insisted that it used a five-acre "rule of thumb." DEC has discretion under 18 AAC 72.065(a)(1) and (2) to waive the requirements of submitting drawings and written descriptions of the waste disposal system, and of a plot showing relationships between waste disposal and drinking water. The regulation does not contain a provision giving DEC discretion to use informal "rules of thumb" for making determinations to reduce burdens of proof for soil data based upon factors such as lot size and remoteness. We therefore conclude that DEC has also acted arbitrarily and capriciously in its decisions concerning Noey's soil information and proposed lot sizes.[14]

### III. *Conclusion.*

Noey has made repeated legitimate attempts to meet the requirements of the regulations and DEC's objections to his subdivision proposals. Both the hearing officer and the Commissioner concluded that the record raises a certain amount of sympathy for Noey. Upon careful evaluation of the record, we conclude that DEC has employed inconsistent and unarticulated subjective standards in reviewing and rejecting Noey's second, third, and fourth subdivision waste disposal plans. In our view the record does not support several of the hearing officer's findings and conclusions. Therefore, we hold that in several significant respects the decisions to reject Noey's plans were made on an arbitrary basis, or were not in accordance with law. Therefore, these decisions must be reversed and remanded for further proceedings consistent with this opinion.

■■■ The question remains as to what relief is appropriate. Noey asks us to order DEC to approve his subdivision proposal. We do not believe such an order is appropriate at this point. Rather, we believe that the matter should be remanded to DEC with directions that it afford Noey an opportunity to supplement his soil data information if necessary, and to revise his proposal to include an underdrain in regard to his proposed sand filtration system.[15]

14. Review of the record discloses that several of the hearing officer's findings and conclusions are erroneous. His conclusion that Noey's proposals lacked credibility because Noey's expert consultant had never visited the Bear Cove site lacks a reasonable basis in law, because the regulations do not require an on-site visit by the person who analyzes site data or designs the waste disposal system. The finding and conclusion that the consultant had never designed a system which successfully operated under site conditions also has no reasonable basis. Finally, the conclusion that Noey's consultant was not qualified by professional engineering registration to offer services to clients lacks a reasonable basis, because the regulations do not require consultants to be engineers, and there is no question that Noey's consultant was otherwise well qualified.

15. The record and testimony indicate that a sand filtration system has been shown to be generally satisfactory for treating graywater, and if the underdrain resolves the disposal problem, as one DEC official testified it might, then DEC should approve such a proposal. Further, the record and testimony show that use of incineration systems are generally adequate for treating and disposing of blackwater wastes in Alaska. Composting also was shown to be a generally adequate method, although it requires careful maintenance by the lot owner. We again note that the regulation does not require a developer to be the guarantor for an individual lot owner's maintenance responsibilities; the developer is only required to identify those persons who will own, operate, and maintain the system. 18 AAC 72.065(a)(6).

We construe the relevant statutes and regulation to mean that all that is required of a developer is to submit a waste disposal proposal that will be generally adequate for meeting reasonably foreseeable waste disposal needs. Under the present regulations, a developer is not required to design a system to meet unproven speculations regarding long-term, maximum future development of a subdivision. Rather, DEC should approve those proposed systems which are shown to be generally adequate for the site conditions. A plat notice restricting individual lot owners from employing a different system without DEC approval is a reasonable means of giving DEC another opportunity to review individual proposals in the future as conditions or technology may change. Thus, DEC should approve any of Noey's proposals which includes the use of systems shown to be generally adequate for treating and disposing of waste under site conditions.[16]

REVERSED and REMANDED.

MATTHEWS, J., not participating.

---

16. By this holding we do not purport to limit DEC's ability to further "attach terms and conditions to subdivision plans needed to ensure compliance with" pollution control law. 18 AAC 72.065(c).