**1902 ATLANTIC LIMITED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 637–87L.**

United States Claims Court.

June 19, 1992.

---

Edward R. Baird, Jr., Norfolk, Va., for plaintiff. James J. Knicely, Williamsburg, Va., of counsel.

Fred R. Disheroon and Susan V. Cook, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

In this Fifth Amendment temporary taking case, plaintiff seeks damages allegedly arising from defendant's denial of a Section 404 permit under the Clean Water Act to discharge dredged or fill material on plaintiff's land. Trial was held in June, 1991. Oral and documentary evidence were admitted at the trial, and post-trial briefs were filed. After careful consideration of the entire record, the court finds that defendant's actions do not constitute a temporary taking. The reasons for this decision are set forth below.

### Factual Background

On April 7, 1981, plaintiff, 1902 Atlantic Limited ("Atlantic"), purchased an 11 acre borrow pit in Chesapeake, Virginia for $25,-000. Atlantic bought the property intending to fill it with construction debris resulting from neighboring demolition projects. Once filled, plaintiff expected that the land could be used for commercial or industrial development. The borrow pit resulted from the excavation of highlands for the construction of a highway overpass.[1] The pit was connected by a ditch to Mill Dam Creek, a tributary of the southern branch of the Elizabeth River. As a result, the borrow pit was subject to inundation from the creek's tidal flow and, therefore, contained wetlands within its boundaries. The United States Army Corps of Engineers ("Corps") asserted jurisdiction over those wetlands pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

On April 22, 1981, plaintiff applied to the Corps for a Section 404 permit to fill the entire borrow pit area. At that time, Atlantic had obtained all of the necessary local and state permits and had substantially complied with all other restrictions on its proposed land development. On June 8, 1981, the Corps issued a preliminary assessment of plaintiff's permit request. The Corps recommended that the application be denied as the proposed project was not water dependent. The "water dependency" rule essentially requires that any proposed filling of wetlands be for a project which is dependent upon water, such as a marina. See 33 C.F.R. § 320.-4(b)(4) and 40 C.F.R. § 230.10(a)(3). On July 10, 1981, the Corps advised plaintiff of its objections. Atlantic immediately submitted additional support for an amended application which proposed the digging of a

---

**1.** The Virginia Department of Highways and Transportation (VDOT) had earlier acquired a portion of the subject borrow pit in connection with the construction of Interstate 464, which now borders the property to the northeast. In 1979, the U.S. Army Corps of Engineers permitted the VDOT to fill part of the borrow pit.

ditch around a portion of the perimeter of the borrow pit and reducing the 32,000 square feet of effected wetlands to approximately 15,000 square feet.

On October 26, 1981, the Corps advised plaintiff of its preliminary decision to deny the permit, notwithstanding the proposed mitigation. Atlantic again tried to satisfy the Corps' objections but was unsuccessful. On July 27, 1982, plaintiff filed suit in the United States District Court for the Eastern District of Virginia, Norfolk Division ("District Court"), seeking equitable relief, a declaration that defendant had taken the land, and a declaration that the Corps' actions were arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Two days later, on July 29, 1982, Colonel Ronald E. Hudson, Corps District Engineer, denied plaintiff's permit application. This denial was premised upon the Corps' conclusion that plaintiff's proposed project violated both the Corps' Wetland Policy and the Environmental Protection Agency's ("EPA") guidelines. *See* 40 C.F.R. Part 230.

On September 28, 1983, following a trial on the merits, the District Court issued an opinion finding that the Corps had unlawfully taken Atlantic's property. The District Court remanded the matter to the District Engineer for reconsideration of plaintiff's permit application "in accordance with the views expressed in said opinion, or in the alternative, that the District Engineer commence condemnation proceedings if funds were available for this purpose." [2]

On June 23, 1984, the Corps issued a preliminary environmental assessment concerning its reconsideration of plaintiff's application. On June 28, 1984, the Corps advised Atlantic that it intended to once again deny the permit application. The Corps, acting through Col. Hudson, formally denied the application on July 11, 1984.

Almost immediately after issuing the denial, Col. Hudson retired and was replaced by Col. Claude O. Boyd, III.

Plaintiff promptly filed a motion in the District Court to compel the Corps' compliance with the court's previous order. On January 29, 1985, the District Court ordered compliance within 21 days. This order was followed by a written opinion on February 8, 1985. On April 3, 1985, the Corps issued a Section 404 permit to plaintiff, authorizing Atlantic's amended proposal. By that time, however, several of the state and local permits for the project had expired. Thus, plaintiff's fill operations were delayed until June 3, 1986. Unfortunately, due to flooding, the preparatory work on the site did not begin until the fall of 1987. By April, 1991, approximately 30–40 percent of the approved area had been filled, but no construction had begun.

*Contentions of the Parties*

Plaintiff contends that the Corps' actions constituted a temporary taking from October 26, 1981, when the Corps issued its preliminary denial of Atlantic's permit application, until June 3, 1986, when all of the necessary state and local permits had been reissued. Atlantic asserts that it has satisfied the three pronged test upon which the courts have consistently relied in determining whether governmental regulation has resulted in an unconstitutional taking. *See Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986). That is, plaintiff argues that the Corps' denial of its permit application had a severe economic impact, that it substantially interfered with Atlantic's investment-backed expectations, and that the character of the Government's actions smacked of bad faith and abuse of discretion.

Plaintiff alternatively argues that the Corps' regulation in this case did not substantially advance a legitimate governmen-

---

**2.** *1902 Atl. Ltd. v. Hudson,* 574 F.Supp. 1381, 1407 (ED Va 1983). As opposed to eminent domain, which is a legal proceeding wherein the Government asserts its authority to condemn property, inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking

of his property when condemnation proceedings have not been instituted.'" *Agins v. Tiburon,* 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 2140 n. 2, 65 L.Ed.2d 106 (1980) (quoting *United States v. Clarke,* 445 U.S. 253, 255–58, 100 S.Ct. 1127, 1129–30, 63 L.Ed.2d 373 (1980)).

tal interest. In this regard, Atlantic relies upon the evidence it submitted at trial which plaintiff believes showed defendant's improper motivation, unfair conduct and unreasonable protraction of the proceedings attributable to the Government's intractable pattern of denials. Atlantic contends that the Corps' actions in this case have exhibited such an egregious disregard of the regulatory process as to rise to the level of "irrefragable proof" of defendant's bad faith sufficient to provide this court with an additional basis for finding a taking. *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954).

In response, defendant contends that plaintiff has not shown that it was deprived of all reasonable use of its property during the period in question. Therefore, the Government argues that there has been no taking for which compensation is due. Defendant asserts that the mere passage of time during the permit issuance process under the Clean Water Act does not constitute "extraordinary delay" requiring the finding of a taking. *Dufau v. United States*, 22 Cl.Ct. 156, 163 (1990). In this vein, defendant argues that its temporary denial of a fill permit did not affect a legally protected property right of Atlantic.

Alternatively, the Government argues that it is not liable for the District Engineer's actions which the District Court found to be both unauthorized and a taking. Defendant further contends that the finding that the District Engineer acted without proper authority is binding upon this court.[3] However, assuming for the sake of argument that the Corps' actions amounted to a temporary taking of plaintiff's property, the Government disputes both the time period in which Atlantic's rights were affected and plaintiff's calculation of damages.

## DISCUSSION

I. *Fifth Amendment taking standards.*

■ The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without the payment of just compensation. The Supreme Court has recognized that this mandate extends to governmental land use regulation where it "does not substantially advance legitimate state interests," or if it " 'denies an owner economically viable use of his land.' " *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 155 (1990) (quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). While often considered as one issue, legitimate state interest and economic viability are separate inquiries. "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141. Regulation which bears a substantial relationship to the public welfare and does not inflict irreparable damage on the property owner is facially constitutional. *Id.* at 261, 100 S.Ct. at 2142.

There is no precise formula for determining whether governmental regulation has deprived a landowner of economically viable use of his property. The court must instead make "ad hoc, factual inquiries into the circumstances of each particular case." *Connolly*, 475 U.S. at 224, 106 S.Ct. at 1026.

> To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action."

*Id.* at 224–25, 106 S.Ct. at 1026 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). *See also Keystone Bituminous*

---

**3.** The Government previously argued that the District Court's finding that plaintiff's land had been unlawfully taken was *res judicata* upon this court. In an opinion issued March 13, 1990, the court held that the District Court's judgment that there had been a taking was not binding.

*Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494–95, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987).

Plaintiff alleges that it was temporarily deprived of the economic viability of the borrow pit as a result of defendant's denial of its permit application and the Corps' protracted review process. Just as in a permanent taking claim, plaintiff must show that substantially all economic use of its property was denied during the time in question. "[T]emporary takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) (noting Justice Brennan's dissent in *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981), in which he opined that "[n]othing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable.").

For the reasons which follow, the court finds that plaintiff has satisfied the *Connolly* three prong test, but has failed to prove a temporary taking as Atlantic never had a property right in the fill permit during the periods in question, nor did the administrative review process constitute extraordinary delay.

### A. Economic impact and interference with investment-backed expectation.

■ Plaintiff contends that its property was temporarily taken beginning on October 26, 1981, when its permit application was preliminarily denied. However, even assuming that there was a temporary taking, it could not have begun then. It is clear that the purpose of the Corps' preliminary denial was to invite the submission of any additional information which Atlantic chose to submit in support of its application. As plaintiff's counsel explained at post-trial oral argument:

> We feel it [the starting date of the alleged taking period] should be October 26 because that was the date the Corps, in effect, pickled the property. It said, we are going to deny your permit unless you provide us with countervailing information that it should be granted.

> \*   \*   \*   \*   \*   \*

> Now, 1902 took steps. It attempted to gather more information.

In response to the Corps' preliminary denial, Atlantic submitted additional data and amended its application. Disapproval of the amended application was not a foregone conclusion at that point. Further, plaintiff has submitted no evidence whatever that the Corps negligently or intentionally delayed its decision. In fact, the period of time the Corps took to consider plaintiff's permit application under the circumstances was not unusual. Consequently, the court will not consider the period prior to the July 29, 1982 issuance of the Corps' final decision.

"In an inverse condemnation case, the court first has to compare the value of the property before the regulation with the value remaining after the regulation." *Formanek v. United States*, 18 Cl.Ct. 785, 798 (1989). Plaintiff presented evidence at trial that prior to July 29, 1982 the subject property had a value of at least the $25,000 purchase price. In fact, the property may have been worth more due to the state and local permits which had been issued for its development. After the Corps' denial, plaintiff argues that the land had no practical alternate uses. Mr. D.L. McKnight, the Government's appraiser, valued the undeveloped site at between $3,000 to $5,000. Assuming an average value of $4,000, such value would represent about an 88% reduction from the purchase price.[4]

---

4. The court accepts plaintiff's valuation of the property for the sake of argument in this instance. In a temporary taking case, however, the measure of damages is the fair rental value of the property during the time in question. *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1581 (Fed.Cir.1990). As the court finds that no temporary taking occurred in the instant case, plaintiff's insistence on proving fair market value rather than leasehold value is inconsequential. However, plaintiff's failure to prove damages would have been fatal to

Defendant, however, asserts that a speculative market existed for the property based upon either a future regulatory change, a request by plaintiff for a lesser permit, or the preservation interests of some nature conservationists. "[T]he court sitting as finder of fact must discount proposed uses that do not meet a 'showing of reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future.'" *Loveladies Harbor,* 21 Cl.Ct. at 158 (quoting *United States v. 341.45 Acres of Land,* 633 F.2d 108, 111 (8th Cir.1980) (emphasis in the original)). In the instant case, the court finds that defendant's speculative market theory fails to meet the standard of reasonable probability. Mr. McKnight admitted that the site had "limited utility" and could offer no proof of demand for the property.[5] Absent a realistic market for the property, the court finds that the Corps' action had a severe economic impact on Atlantic during the period in question. Thus, unquestionably, plaintiff's proof met the first prong of the *Connolly* test.

Furthermore, it is without question that Atlantic purchased the property as an investment solely for the purpose of filling and developing the site. Consequently, its investment backed expectations were frustrated beginning with the Corps' July 29, 1982 denial, and continuing until the permit was finally issued on April 3, 1985. Therefore, the court finds that plaintiff has also met the second prong of the *Connolly* test.

B. Character of the governmental action.

Plaintiff argues, and the court agrees, that defendant misconstrued the applicable regulations when it denied the initial application solely based on the water dependency rule. A Section 404 permit may still be issued for a non-water dependent use provided that the applicant can show that it is in the public interest. Moreover, the Corps must consider "[a]ll factors which may be relevant to the proposal" including "conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention ... and, in general, the needs and welfare of the people." Section 320.4(a)(1). The Corps considered plaintiff's amended application in light of the additional evidence submitted, the amount of mitigation offered, and the importance of the wetlands which would be lost as a result of the partial filling of the borrow pit. Nonetheless, the District Court found the Corps' denial of Atlantic's amended application to be arbitrary and capricious.

As explained above, the Corps failed to properly interpret the District Court's order upon reconsideration. Instead, the Corps took into account additional facts not found by the District Court and then issued its second denial. The Corps' actions were in accordance with its past practices and ordinarily would have been proper. The Corps' consideration of additional evidence also clearly conforms with the mandate of Section 320.4(a)(1). However, the Corps' decision went against the clear instructions of the District Court. If the Corps did not act in bad faith, it certainly acted in knowing disregard of a federal court order. While the District Court was understandably incensed at the Corps' response, this court cannot agree that defendant's motives were sinister. Instead, this court agrees that the clear weight of the evidence shows that the Corps officials disregarded the marginal importance of the borrow pit as a wetlands site. Therefore, the court further finds in accordance with the District Court's judgment that the Corps' second permit denial was arbitrary and capricious. While the District Court's

---

its recovery had Atlantic been able to prove the other essential elements of its case.

5. Mr. McKnight testified as follows:
Mr. Baird: What economic use could you put to the site?
Mr. McKnight: Well, that—I can't think of any offhand without having an extensive investi-

gation, but the site, I will agree, did not have a lot of uses. It was a property suited for someone to buy and speculate on the change in the laws or something of this effect that would enhance its value at some point in the future.
Trial transcript at 566.

findings in this regard are not binding here, they are persuasive upon the court. For the foregoing reasons, the court is satisfied that the character of the Government's actions were arbitrary and capricious in that the Corps disregarded the law and the evidence in its denial of the amended permit. Consequently, Atlantic has met the requirements of the third and final prong of the *Connolly* taking test.

## II. *Plaintiff's permit entitlement.*

Notwithstanding the above findings, the basic and irreparable flaw in plaintiff's case stems from the fact that never during the entire administrative and judicial process was plaintiff actually entitled to a permit. The fundamental inquiry in a taking case is whether the challenged action interfered with a legally protected right. "[N]ot all economic interests are 'property rights;' only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945).

The District Court's February 8, 1985 order made abundantly clear that the Corps had three choices: (1) it could either comply with the order by issuing the permit; (2) the Corps could deny the permit and face possible contempt charges; or (3) appeal the decision. During the 21–day period which the District Court gave the Corps to comply with its second order, the Corps abandoned its appeal to the Circuit Court. Until that time, pursuant to the Clean Water Act and the Administrative Procedure Act (APA), defendant had not exhausted its statutory right of appeal. The Corps' permit procedures do not offer an administrative appeal from a permit decision. *See* 33 C.F.R. Parts 320–ff. Rather, any appeal must be taken to the federal district court under the APA. Plaintiff was, of course, ultimately issued a permit. What Atlantic now alleges was a temporary taking was the period for governmental decision making permitted by statute. Thus, the only

way plaintiff can recover is to prove that this period constituted extraordinary delay.

As the court explained above, there is no question that the value of the subject property was substantially diminished until the issuance of the fill permit. However, "mere fluctuations in value during the process of government decision making, absent extraordinary delay, are 'incidents of ownership' ... which cannot be considered a 'taking' in the constitutional sense." *Agins v. Tiburon*, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (citing *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1980)); *see also Dufau v. United States*, 22 Cl.Ct. 156, 163 ("key factor in evaluating the reasonableness of the length of the permit application process for a temporary taking claim is whether it amounts to extraordinary delay"). Nor is it sufficient for plaintiff to show that the land was essentially "pickled" during the District Court litigation which Atlantic initiated. As the Supreme Court explained:

> Temporary harms ... are an unfortunate but necessary by-product of disputes over the extent of the government's power to inflict permanent harms without paying for them. Every time a property owner is successful, in whole or in part, in a challenge to a governmental regulation ... he is almost certain to suffer some temporary harm in the process. At the least, he will usually incur substantial revenue losses because the use of his property has been temporarily curtailed while the dispute is being resolved.

*Williamson County Regional Planning Com. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 204, 105 S.Ct. 3108, 3126, 87 L.Ed.2d 126 (1985).

The unfortunate situation contemplated in *Williamson* is precisely the one which confronts the court in the instant case. The temporary harms suffered by Atlantic during the period its permit was denied were certainly significant, but the Government cannot be charged with the delay necessary to complete the review process. Accordingly, there is no basis for finding a

temporary taking under applicable and binding legal precedent.

However, the question remains as to whether defendant is chargeable with the delay caused by the necessity of obtaining the state and local permits which had expired during the District Court proceedings. Simply put, the answer is no. There is no evidence to suggest that Atlantic was impeded in any way by the Government from maintaining the viability of the permits it had previously obtained. It would appear that plaintiff, by exercising rudimentary foresight, could have kept its permits current until a final decision on the Section 404 permit was issued. The lapse of the state and local permits was either the fault of Atlantic or state and local officials, but is certainly not the fault of the Government. The delay inherent in complying with state and local regulation cannot be reasonably attributed to defendant. Consequently, the court holds that the period of delay following the Corps' issuance of the Section 404 permit also does not constitute a temporary taking.

## CONCLUSION

Plaintiff's evidence showed that the borrow pit is located in an industrial area and is ideally suited for filling and development. The wetlands area in the pit did not develop from long term natural conditions but resulted more or less accidentally from the recent addition of a ditch connecting the pit with a stream. Even the court's relatively superficial view of the site and the surrounding areas confirmed these facts and also revealed the marginal nature of the wetlands which had developed in the pit. The entire site was dry highlands prior to the construction of the highway overpass. It is also significant that the Corps previously allowed the VDOT to fill a significant portion of the pit.

No matter how vigorously defendant's experts contend otherwise, maintenance of the subject wetlands was not of vital impor-

tance to the area's ecology. Even if the relatively few acres of wetlands involved in this suit were totally destroyed by fill operations, the area's water resources would not have been significantly polluted or damaged. On the record before the court, this conclusion appears justified even after giving due deference to the Corps' expertise in Section 404 permit considerations. Consequently, the court agrees with the District Court's conclusion that the Corps' permit denials were arbitrary and capricious.[6]

However, for the above assigned reasons, the court holds that no temporary taking occurred during any of the periods claimed by plaintiff. Consequently, the court finds for defendant. The Clerk of the Court is hereby ordered to dismiss the complaint. No costs.

---

**6.** Had plaintiff merely accepted the Corps' denial of the permit or if Atlantic had lost in the District Court, then the Corps' denial might have constituted a permanent taking. Although plaintiff would then have been entitled to com-

pensation, the temporary losses here incurred prior to the Corps' issuance of the fill permit are the "inevitable cost of doing business in a highly regulated society." *Williamson*, 473 U.S. at 204, 105 S.Ct. at 3126.