Robert **CANNONE** and William **Lamoureaux,** individually, and the Department of Environmental Conservation, State of Alaska, Petitioners,

v.

Stephen W. **NOEY,** Helen H. **Noey,** and Pac–Rim Financial Services, a partnership, Respondents.

No. S–5669.

Supreme Court of Alaska.

Feb. 4, 1994.

James E. Cantor, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for petitioners.

Mark S. Bledsoe, Bledsoe & Knutson, Anchorage, for respondents.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

The Department of Environmental Conservation ("DEC" or "State") petitioned for review of a ruling by the superior court that an administrative decision, subsequently overturned as arbitrary, *per se* establishes a temporary taking. The superior court held that under the Alaska and United States Constitutions, a temporary taking had occurred, and therefore the property owners were entitled to just compensation. We reverse.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Stephen Noey, Helen Noey, and Pac–Rim Financial Services, a partnership (collectively referred to hereafter as "Noey"), developed plans to subdivide their land in a remote area into a recreational subdivision of sixteen one-acre lots. DEC reviewed Noey's lot configuration plans and rejected them based on the accompanying wastewater treatment and disposal proposals. The rejections were af-

firmed first by an administrative hearing officer and then by the superior court.

In *Noey v. Department of Environmental Conservation*, 737 P.2d 796 (Alaska 1987), we reversed the superior court's decision. With respect to Noey's second, third and fourth proposals, we held that DEC had "employed inconsistent and unarticulated subjective standards" and that therefore "the decisions to reject Noey's plans were made on an arbitrary basis, or were not in accordance with law." *Id.* at 806. We remanded the case for further proceedings.[1] *Id.* at 807.

Our opinion was issued on May 29, 1987. On July 20, 1988, Noey filed suit in superior court, claiming that the State had violated his civil rights and effected an inverse condemnation. He moved for partial summary judgment on the inverse condemnation claim. On February 24, 1989, the superior court ruled that his claim was not ripe because Noey had failed to exhaust his administrative remedies, since he had not sought a decision from DEC specifically relating to a particular disposal system or systems.

As a result of this ruling, Noey submitted another plan to DEC in March 1989 proposing treatment and disposal of gray water by means of a sand filter; alternatively, he proposed a solar-powered incinerator. These plans were rejected by DEC on May 23, 1989, for lack of "adequate design and supportive information to demonstrate that the proposed systems could reasonably be expected to provide a means of adequate wastewater disposal for the conditions existing at Bear Cove." Noey appealed this rejection to a hearing officer, who concluded on March 31, 1991, that since Noey had failed to provide sufficient information, DEC should have notified him of the specific information required and established a deadline for receipt of the requested information. Only if the information had not been submitted by the deadline should the application have been denied. Accordingly, the hearing officer vacated the application's rejection and remanded it for consideration of supplemental information. On May 17, 1991, DEC approved the subdivision and required plat notes concerning waste and wastewater as follows:

> Lots in this subdivision are approved for one of the following types of waste and wastewater disposal:
>
> 1. Sealed systems with no discharge to the land or water.
>
> 2. Other systems designed by an engineer registered to practice in the state of Alaska. System designs must be reviewed and approved by the Department of Environmental Conservation in accordance with 18 AAC 72.210–72.285 prior to construction.

Following final subdivision approval, Noey renewed his motion for partial summary judgment. The trial court granted Noey's motion, ruling that a temporary taking by the State had occurred during the period from August 15, 1984, when the administrative hearing officer affirmed the denial of the permit, until May 29, 1987, when this court issued its decision.[2]

The trial court also ruled that a temporary taking might have occurred during a period following our decision. For the period from

---

1. Although Noey requested that this court order DEC to approve his subdivision, we did not grant that relief. Instead, we ordered that the case be remanded to DEC "with directions that it afford Noey an opportunity to supplement his soil data information if necessary, and to revise his proposal to include an underdrain in regard to his proposed sand filtration system." *Noey v. Department of Envtl. Conservation*, 737 P.2d 796, 806 (Alaska 1987). We noted that the relevant statutes and regulations required a developer "to submit a waste disposal proposal that will be generally adequate for meeting reasonably foreseeable waste disposal needs." *Id.* at 807. We concluded:

> DEC should approve those proposed systems which are shown to be generally adequate for the site conditions. A plat notice restricting individual lot owners from employing a different system without DEC approval is a reasonable means of giving DEC another opportunity to review individual proposals in the future as conditions or technology may change. Thus, DEC should approve any of Noey's proposals which includes the use of systems shown to be generally adequate for treating and disposing of waste under site conditions.
>
> *Id.*

2. Excluded from this period was the time from February 18, 1985 until March 10, 1986, a period of slightly more than a year, during which Noey sought and obtained extensions of time to file his brief.

May 23, 1989, when DEC denied Noey's new application, to March 31, 1991, when the denial was vacated by the hearing officer, the superior court ruled that a temporary taking might have transpired depending on "whether part or all of the delay during this period was due to Noey's failure to provide additional information, or due to arbitrariness on the part of DEC."

From these decisions of the superior court, the State sought review. We granted review and reversed the court's decisions. This opinion explains our ruling.

## III. DISCUSSION

■ "Inverse condemnation in its classic form entails a physical invasion of private property by government without formally exercising the power of eminent domain." *Ehrlander v. State, Dep't of Transp.,* 797 P.2d 629, 632 (Alaska 1990). This case does not fit the classic form because no physical invasion of Noey's property has occurred. However, inverse condemnations may also result from government regulatory activity.

As we stated in *Ehrlander:*

Recently, in *Homeward Bound, Inc. v. Anchorage School District,* 791 P.2d 610 (Alaska 1990), we acknowledged that an action for inverse condemnation might lie where a land-use planning classification deprives a private property owner "of the economic advantages of ownership of the property." *Id.* at 614. Other jurisdictions have also recognized that a regulation or land use decision may give rise to an inverse condemnation action.

*Ehrlander,* 797 P.2d at 632–33. In *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the United States Supreme Court traced the concept of regulatory takings to Justice Holmes' opinion in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922):

Justice Holmes recognized in *Mahon,* however, that if the protection against physical appropriations of private property was to

be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits. If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." These considerations gave birth in that case to the oft-cited maxim that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

*Lucas,* —— U.S. at ——, 112 S.Ct. at 2892–93 (citations omitted).

Noey claims in this case that the State, in exercising its authority to approve subdivisions, has gone too far, and that a temporary regulatory taking was effected. "The United States Supreme Court has recognized two classes of *per se* takings: (1) cases of physical invasion and (2) cases where a regulation denies a landowner of all economically feasible use of the property." *Anchorage v. Sandberg,* 861 P.2d 554, 557 (Alaska 1993) (citing *Lucas,* —— U.S. at —— ——, 112 S.Ct. at 2892–95). If a case does not fall into either of these categories, "courts must engage in a case-specific inquiry to determine whether governmental action effects a taking." *Id.* While the fact patterns of regulatory takings are too varied to be amenable to analysis under a single formula, we have identified a number of factors which the courts should consider:

(1) the character of the governmental action; (2) its economic impact; and (3) its interference with reasonable investment-backed expectations. The legitimacy of the interest advanced by the regulation or land-use decision is also relevant to this inquiry.

*Id.; State, Dep't of Natural Resources v. Arctic Slope Regional Corp.,* 834 P.2d 134, 139 (Alaska 1991).[3]

*Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (quoting *PruneYard Shopping Ctr. v. Rob-*

---

**3.** These factors mirror those employed by the United States Supreme Court in determining whether a permanent taking has occurred.

■ In the present case, the trial court was persuaded that a *per se* taking had occurred which had denied Noey all economically feasible use of his property. This determination is wholly unsupported in the record.[4] No evidence reveals that Noey was unable to sell this sixteen-acre parcel for a substantial price to a purchaser who either wished to attempt a subdivision having larger lots or to use the entire parcel for the purchaser's own recreational purposes. Further, no evidence indicates that Noey himself could not have subdivided using larger lots or used the property for his own recreational purposes or as a commercial lodge. The United States Supreme Court has observed that it is an "extraordinary circumstance" when no productive or economically beneficial use of land is permitted. *Lucas,* — U.S. at ——, 112 S.Ct. at 2894. Noey has not established that this case is an example of such an extraordinary circumstance.

■ In deciding Noey's motion for summary judgment, the trial court stressed this court's determination that certain actions of the State had been arbitrary and capricious.

The State argues that the trial court seemed to treat this determination as a substitute for conventional takings analysis. Some observations by the trial court lend credence to this view.[5] If that was the trial court's view, the court erred.

■ The arbitrary and capricious standard is the customary standard of review by which this court reviews non-adjudicatory agency action. *State v. 0.644 Acres, More or Less,* 613 P.2d 829, 833 (Alaska 1980); *Moore v. State,* 553 P.2d 8, 34 n. 12 (Alaska 1976). This standard of review covers a broad range of activity.[6] In the present case, DEC's decision was found to be arbitrary because DEC used "inconsistent and unarticulated subjective standards" and reached "conclusions unsupported by the record." *Noey,* 737 P.2d at 804–06.[7] We need not decide in this case whether, or to what extent, a finding that an agency's conduct is arbitrary may be relevant in conducting the multi-factor inquiry into whether a regulatory taking has been accomplished in non-*per-se* cases. It is enough to observe that an arbitrary finding is not a substitute for the takings inquiry.[8]

*ins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980)). When the question is whether there has been a temporary taking the Court has employed its permanent taking methodology, determining whether the challenged governmental action would amount to a permanent taking if uncorrected or unlimited in time from the outset. *Lucas,* — U.S. at —— n. 17, 112 S.Ct. at 2901 n. 17; *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987) (" '[T]emporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings...."). Without implying that this is all that may be involved in the determination of temporary takings, we suggest that it is a useful beginning.

4. A summary judgment movant bears the burden of demonstrating the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Alaska R.Civ.P. 56(c); *McGee Steel Co. v. State ex rel. McDonald Indus. Alaska, Inc.,* 723 P.2d 611, 615 (Alaska 1986).

5. The court stated:
   [A]ll those cases seem to suggest to me that ... if there is a regulatory decision-making process, it takes more than a usual period of time that deprives a property owner of the use of its land and we have the situation here where the Court has found that it was arbitrary on the

part of the government agency, then you have a taking, and that's my finding.

6. We have held that failing to consider important information may make a decision arbitrary, *0.644 Acres;* *S.E. Conservation Council v. State,* 665 P.2d 544, 549 (Alaska 1983), and have suggested that a decision based on irrelevant factors may be arbitrary. *0.644 Acres,* 613 P.2d at 833 n. 13.

7. DEC's determinations did not necessarily indicate malice or an intent to harm Noey. We do not suggest that malice or an intent to harm necessarily is relevant to the question whether a given governmental action is a taking. If an owner is denied productive use of his or her property, that may be a taking regardless of the mental state of the involved government official, whether it be malicious, negligent, non-negligent but mistaken, or non-negligent and not mistaken.

8. In *1902 Atlantic Ltd. v. United States,* 26 Cl.Ct. 575 (1992), the district court found that the administrator's denial of an amended application for a permit was arbitrary and capricious. Nonetheless, the court denied the developer's claim for a temporary taking, reasoning that the period between the administrator's arbitrary conclusion and the time that it was corrected by the district court on appeal under the federal Administrative Procedure Act was merely part of the process of government decision making: "The

## IV. CONCLUSION

For the above reasons we have RE-VERSED the grant of partial summary judgment to the plaintiff. This case is RE-MANDED to the superior court for further proceedings.

BURKE, J., not participating.

temporary harms suffered by Atlantic during the period its permit was denied were certainly significant, but the government cannot be charged with the delay necessary to complete the review process." *Id.* at 581.

The delay which commonly occurs when a permit or regulatory approval is sought is not regarded as a regulatory taking. *Steinberg v. City of Cambridge,* 413 Mass. 736, 604 N.E.2d 1269, 1274 (1992). Thus, in *First English,* 482 U.S. at 321, 107 S.Ct. at 2389, the Court distinguished compensable temporary takings, which would result if an ordinance were held invalid under the Takings Clause, from "the quite different questions that would arise in the case of normal delays in obtaining building permits, changes of zoning ordinances, variances, and the like, which are not before us."